## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

HERNAN JOSE M. M.,

Case No. 26-cv-481 (LMP/DTS)

Petitioner,

v.

**ORDER GRANTING
HABEAS PETITION**

DAVID EASTERWOOD, *Field Office
Director of Enforcement and Removal
Operations, St. Paul Field Office,
Immigration and Customs Enforcement*;
KRISTI NOEM, *Secretary of the U.S.
Department of Homeland Security*;
TODD LYONS, *Acting Director of U.S.
Immigration and Customs Enforcement*;
PAM BONDI, *Attorney General of the
United States*; and RYAN SHEA,
*Freeborn County Sheriff*,

Respondents.

Solomon Daniel Steen, **Contreras Edin Law, P.A., Saint Paul, MN**, for Petitioner.

Friedrich A. P. Siekert, **United States Attorney's Office, Minneapolis, MN**, for Respondents David Easterwood, Kristi Noem, Todd Lyons, and Pam Bondi.

David John Walker, **Freeborn County Attorney's Office, Albert Lea, MN**, for Respondent Ryan Shea.

Petitioner Hernan Jose M. M., a Venezuelan national, was arrested by United States Immigration and Customs Enforcement ("ICE") in January 2026 following the termination of his humanitarian parole in March 2025. He filed a petition for a writ of habeas corpus, asserting that the termination of his parole was unlawful and that his ongoing detention without a bond hearing violates the Immigration and Nationality Act ("INA") and the Due

Process Clause of the Fifth Amendment.  ECF No.1.  For the reasons discussed below, the Court concludes that the termination of Hernan Jose M. M.'s parole was lawful, but the Court agrees that his ongoing detention without a bond redetermination hearing violates the INA.  Accordingly, the Court grants Hernan Jose M. M.'s petition for a writ of habeas corpus and orders Respondents (the "Government") to conduct a bond redetermination hearing.

## BACKGROUND

### I.    The CHNV Parole Programs

In October 2022, the United States Department of Homeland Security ("DHS") announced an effort to "address the challenges posed by irregular migration" of Venezuelan nationals by "providing a process for certain such nationals to lawfully enter the United States in a safe and orderly manner."  Implementation of a Parole Process for Venezuelans, 87 Fed. Reg. 63507, 63507 (Oct. 19, 2022) (the "Venezuelan Parole Program").  Under the Venezuelan Parole Program, Venezuelans who were vetted and determined not to be a national security or public safety risk and who had a supporter in the United States who could provide housing and other support could receive advanced authorization to travel to the United States and seek a discretionary grant of parole at a port of entry.  *See id.* at 63508, 63515.  These discretionary grants of parole were limited to a two-year period, during which time parolees could seek humanitarian relief, like a grant of asylum, and receive work authorization.  *See id.* at 63508.  The program further specified that those "who are not granted asylum or other immigration benefits will need to leave the United States at

the expiration of their authorized period of parole or will generally be placed in removal proceedings after the period of parole expires." *Id.*

In January 2023, DHS implemented a similar process for Cuban, Haitian, and Nicaraguan nationals. *See generally* Implementation of a Parole Process for Cubans, 88 Fed. Reg. 1266 (Jan. 9, 2023); Implementation of a Parole Process for Haitians, 88 Fed. Reg. 1243 (Jan. 9, 2023); Implementation of a Parole Process for Nicaraguans, 88 Fed. Reg. 1255 (Jan. 9, 2023) (collectively with the Venezuelan Parole Program, the "CHNV Parole Programs"). DHS later announced in October 2024 that there would be no "re-parole" beyond the initial two-year period for parolees who entered the United States under the CHNV Parole Programs. *See* Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans, 90 Fed. Reg. 13611, 13614 n.24 (Mar. 25, 2025).

On January 20, 2025, President Trump signed an executive order directing the Secretary of Homeland Security to "take all appropriate action to . . . [t]erminate all categorical parole programs that are contrary to the policies of the United States established in [his] Executive Orders, including the [CHNV Parole Programs]." Exec. Order No. 14165, 90 Fed. Reg. 8467, 8468 (Jan. 20, 2025). Consistent with that executive order, DHS published a Federal Register Notice announcing the termination of the CHNV Parole Programs on March 25, 2025. *See generally* Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans, 90 Fed. Reg. 13611 (Mar. 25, 2025). DHS acknowledged that by implementing the CHNV Parole Programs in late 2022 and early 2023, it intended to:

    (i)      enhance border security by reducing illegal immigration between the [ports of entry];

    (ii)     minimize the domestic impact of high levels of illegal immigration by CHNV nationals, particularly in border communities;

    (iii)    improve vetting for national security and public safety;

    (iv)    reduce the strain on DHS personnel and resources;

    (v)     disincentivize a dangerous journey that puts migrant lives and safety at risk and enriches smuggling networks; and

    (vi)    fulfill important foreign policy goals to manage migration collaboratively in the hemisphere.

*Id.* at 13612. DHS concluded, however, that it was "appropriate and necessary to terminate" the CHNV Parole Programs because they "do not serve a significant public benefit, are not necessary to reduce levels of illegal immigration, did not sufficiently mitigate the domestic effects of illegal immigration, are not serving their intended purposes, and are inconsistent with the Administration's foreign policy goals."[1] *Id.*

DHS announced that the "temporary parole period of aliens in the United States under the CHNV parole programs and whose parole has not already expired by April 24, 2025[,] will terminate on that date unless the Secretary makes an individual determination to the contrary." *Id.* at 13611. DHS further directed that "[p]arolees without a lawful basis

---

[1] More specifically, DHS concluded that the CHNV Parole Programs: (1) "did not result in a sufficient and sustained improvement in border security," Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans, 90 Fed. Reg. 13611, 13613 (Mar. 25, 2025); (2) "coincided with an overall increase in CHNV migration," *id.* at 13615; (3) created "significant pressures on localities throughout the country," *id.*; (4) suffered from "significant gaps in the vetting process," *id.* at 13616; (5) "exacerbated backlogs, or risked exacerbating backlogs, for the immigration system writ large," *id.* at 13615, and did not "reduce the burden on DHS personnel," *id.* at 13617; (6) did not deter CHNV nationals from "engag[ing] in dangerous migration," *id.*; and (7) were unnecessary given that "the implementation of President Trump's policies" to "control unlawful immigration" had led to an overall reduction in border encounters, *id.* at 13614.

to remain in the United States following this termination of the CHNV parole programs must depart the United States before their parole termination date." *Id.*

On April 14, 2025, a district court entered an injunction staying the termination of the CHNV Parole Programs. *See Doe v. Noem*, 778 F. Supp. 3d 311, 341–42 (D. Mass. 2025). The Supreme Court stayed the district court's order on May 30, 2025, pending the disposition of an appeal of the district court's order to the First Circuit Court of Appeals. *Noem v. Doe*, 145 S. Ct. 1524, 1524 (2025). Accordingly, the termination of the CHNV Parole Programs became effective as of that date.[2]

## II.    Hernan Jose M. M.'s Parole and Arrest

Hernan Jose M. M. is a native and citizen of Venezuela who fled to the United States fearing political persecution in his home country. ECF No. 1 ¶ 16. He scheduled an appointment with United States Customs and Border Patrol ("CBP") through the CBP One app and presented himself for inspection at the border on August 7, 2023. *Id.*; *see* ECF No. 1-1. The Government states that immigration officials inspected Hernan Jose M. M., determined he did not have proper documentation to enter the United States, and issued a Notice to Appear charging him with removability under the INA.[3] *See* ECF No. 9 at 1–2. Nonetheless, Hernan Jose M. M. was paroled into the United States under the Venezuelan Parole Program. *See* ECF No. 1 ¶ 16; ECF No. 1-1. His two-year parole period was set to

---

[2]    The First Circuit ultimately vacated the district court's injunction. *See Doe v. Noem*, 152 F.4th 272, 291–92 (1st Cir. 2025).

[3]    The Government did not submit the Notice to Appear as an exhibit. However, Hernan Jose M. M. does not dispute the Government's assertion that he has been charged as removable under the INA. *See generally* ECF Nos. 9, 14, 16.

expire on August 5, 2025.  ECF No. 1-1.  Since being paroled into the United States, Hernan Jose M. M. has remained law abiding and has no criminal record.  *See* ECF No. 1 ¶ 17.

On October 23, 2024, Hernan Jose M. M. submitted an I-589 Application for Asylum and for Withholding of Removal to United States Citizenship and Immigration Services ("USCIS").  *See generally* ECF No. 1-4.  The same day, USCIS issued a Receipt Notice to Hernan Jose M. M. acknowledging the submission of his asylum application and stating, "You may remain in the United States until your asylum application is decided." ECF No. 1-5 at 1.  The Receipt Notice explained, however, that Hernan Jose M. M.'s pending asylum application "does not preclude [ICE] or [CBP] from placing [him] into removal proceedings."  *Id.*  The Receipt Notice also informed Hernan Jose M. M. that he could seek work authorization based on his asylum application.  *Id.*  Accordingly, on March 26, 2025, Hernan Jose M. M. submitted an I-765 Application for Employment Authorization, which was approved by USCIS on June 6, 2025.  ECF No. 1-3.

On June 13, 2025, DHS issued a notice to Hernan Jose M. M. informing him that the CHNV Parole Programs, and therefore Hernan Jose M. M.'s grant of parole, had been terminated (the "Termination Notice").[4]  ECF No. 1-2.  The Termination Notice states:

> This notice informs you that your parole is now terminated.

---

[4]    Notably, DHS published the Federal Register Notice terminating the CHNV Parole Programs on March 25, 2026, one day before Hernan Jose M. M. submitted his I-765 application.  *See* Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans, 90 Fed. Reg. 13611 (Mar. 25, 2025); ECF No. 1-3 (noting a "Received Date" and "Priority Date" of March 26, 2025, for Hernan Jose M. M.'s I-765 application).

>   Accordingly, you may be subject to expedited removal pursuant to section 235 of the [INA] or removal proceedings pursuant to section 240 of the INA following the termination of your parole.
>
>   You must leave the United States now if you have not otherwise obtained a lawful basis to remain in the United States. . . .
>
>   If you do not leave, you may be subject to enforcement actions, including but not limited to detention and removal . . . .

*Id.* (emphasis omitted).

Hernan Jose M. M. did not leave the United States after receiving the Termination Notice. He was arrested by ICE on January 9, 2026, ECF No. 1 ¶ 3, and remains in ICE custody at the Freeborn County Jail in Albert Lea, Minnesota, *id.* ¶ 11.

## II.    Procedural Background

Hernan Jose M. M. filed a petition for a writ of habeas corpus on January 20, 2026, asserting that the termination of his parole and his ongoing detention are unlawful. *See generally* ECF No. 1. He requests, among other relief, either his immediate release from custody or an order requiring the Government to conduct a bond redetermination hearing. *See id.* at 22–23. He contemporaneously filed a motion for a temporary restraining order and preliminary injunction requesting essentially the same relief. *See* ECF No. 2 at 2; ECF No. 3 at 24–25.

The Court ordered the Government to respond to Hernan Jose M. M.'s petition by January 28, 2026, "certifying the true cause and proper duration of Hernan Jose M. M.'s confinement," including an explanation of the Government's legal position on Hernan Jose M. M.'s claims raised in his petition and in his motion for preliminary relief. ECF No. 7 at 1–2. The Government timely responded, ECF No. 9, and Hernan Jose M. M. filed a

reply to the Government's response on February 4, 2026, ECF No. 10. After reviewing the parties' initial briefing, the Court determined that it needed additional information and briefing from the parties. *See* ECF No. 11 at 1–2. The Court ordered the parties to submit supplemental briefs by February 17, 2026, with the option to submit responses to each other's supplemental briefs by February 20, 2026. *Id.* The Court has received the parties' supplemental briefs. *See* ECF Nos. 14–17.

## ANALYSIS

Hernan Jose M. M. asserts that the termination of his parole was unlawful because he is entitled to "an individualized determination" as to whether the purposes of his parole have been achieved, ECF No. 1 ¶ 32, which he contends was not conducted as part of DHS's mass termination of the CHNV Parole Programs, *id.* ¶ 19. He argues, therefore, that because the termination of his parole was unlawful, his ongoing detention also is unlawful. *See id.* ¶ 44. Hernan Jose M. M. further asserts that the Government has detained him pursuant to the mandatory detention provisions of 8 U.S.C. § 1225(b)(2). *Id.* ¶ 70. He argues that he is not subject to mandatory detention under that statute and instead is subject to detention, if at all, under the discretionary provisions of 8 U.S.C. § 1226(a), which entitles him to a bond redetermination hearing. *See id.* ¶¶ 28, 70. Hernan Jose M. M. brings claims under the Due Process Clause of the Fifth Amendment, the Administrative Procedure Act ("APA"), the *Accardi* doctrine, and the INA. *See id.* ¶¶ 49–72.

The Government opposes Hernan Jose M. M.'s claims on various grounds, including by asserting that the Court lacks subject-matter jurisdiction over Hernan Jose M. M.'s petition. *See* ECF No. 9 at 9–12. Otherwise, the Government contends that the

8

termination of Hernan Jose M. M.'s parole subjects him to the mandatory detention provisions of 8 U.S.C. § 1225(b)(2) for the duration of his removal proceedings under 8 U.S.C. § 1229a. *See id.* at 1, 5; ECF No. 17 at 5.

Because the establishment of jurisdiction is a "threshold matter," *Thigulla v. Jaddou*, 94 F.4th 770, 773 (8th Cir. 2024), the Court first addresses the Government's arguments relating to the Court's subject-matter jurisdiction before turning to the merits of Hernan Jose M. M.'s claims, *see Brownback v. King*, 592 U.S. 209, 218–19 (2021).

## I.    Subject-Matter Jurisdiction

The Government argues that the Court lacks subject-matter jurisdiction under 8 U.S.C. § 1252(g), which provides that no court "shall have jurisdiction to hear" claims raised by noncitizens that relate to the Government's "decision or action" to "commence proceedings, adjudicate cases, or execute removal orders."  Specifically, the Government asserts that because Hernan Jose M. M.'s claims stem from the decision to detain him for the pendency of his removal proceedings, his claims effectively constitute a challenge to the decision to commence removal proceedings against him.  *See* ECF No. 9 at 11.

As an initial matter, the Government misconstrues the nature of Hernan Jose M. M.'s claims.  He does not challenge the Government's assertion that he is removable or the commencement of removal proceedings against him.  Nor, for that matter, does Hernan Jose M. M. strictly assert that the Government's decision to detain him, full stop, is unlawful.  Instead, he challenges the Government's decision to detain him indefinitely without any opportunity for a bond redetermination hearing.  *See* ECF No. 1 ¶ 54.  "It is well-established that 'absent suspension' by Congress, the Constitution guarantees that the

9

'writ of habeas corpus remains available to every individual detained within the United States." *Abdirashid H. M. v. Noem*, No. 25-cv-4779 (JRT/EMB), 2026 WL 127698, at *2 (D. Minn. Jan. 9, 2026) (quoting *Hamdi v. Rumsfeld*, 542 U.S. 507, 525 (2004)). And a "district court's power includes jurisdiction to hear habeas challenges to immigration-related detention." *Jose J. O. E. v. Bondi*, 797 F. Supp. 3d 957, 965 (D. Minn. 2025) (citing *Zadvydas v. Davis*, 533 U.S. 678, 687 (2001)); *Lopez v. Sessions*, No. 18-cv-4189 (RWS), 2018 WL 2932726, at *6 (S.D.N.Y. June 12, 2018) (citing *Demore v. Kim*, 538 U.S. 510, 516–17 (2003)) ("Federal courts have jurisdiction to hear habeas corpus claims by non-citizens challenging the constitutionality of their detention.").

The Government's argument relies on an overly broad reading of Section 1252(g), which applies "only to [the] three discrete actions" identified in its text. *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 482 (1999). The Government "commenced" removal proceedings against Hernan Jose M. M. in August 2023, when he presented himself at the border for inspection, and then paroled him into the country. *See* ECF No. 9 at 1–2; ECF No. 1 ¶ 1. The Government contends that Hernan Jose M. M.'s January 2026 arrest and subsequent detention is so closely related to the Government's August 2023 decision to commence removal proceedings against him that Hernan Jose M. M.'s claims "arise from" that decision. That argument is unpersuasive. *See Jennings v. Rodriguez*, 583 U.S. 281, 293–94 (2018) (quoting *Gobeille v. Liberty Mut. Ins. Co.*, 577 U.S. 312, 319 (2016)) ("[W]hen confronted with capacious phrases like 'arising from,' we have eschewed 'uncritical literalism' leading to results that 'no sensible person could have intended.'" (internal quotation marks omitted)). This is especially so given that a key part of Hernan

10

Jose M. M.'s claims is a challenge to the Government's interpretation and application of Section 1225(b)(2)'s mandatory detention provision to him in the first place. *See* ECF No. 1 ¶¶ 70–72; *Am.-Arab Anti-Discrimination Comm.*, 525 U.S. at 482 ("It is implausible that the mention of three discrete events along the road to deportation was a shorthand way of referring to all claims arising from deportation proceedings."); *see also Jose J. O. E.*, 797 F. Supp. 3d at 965; *Lopez*, 2018 WL 2932726, at *6.

The Government also—confoundingly—asserts that Hernan Jose M. M. has not exhausted his administrative remedies because he "must seek and be denied a bond hearing from the Immigration Court, and appeal any denial to the [Board of Immigration Appeals ("BIA")]." ECF No. 9 at 10. But the Government acknowledges that "[t]here is no statutory requirement that a habeas petitioner exhaust his administrative remedies before challenging his immigration detention [in federal court]." *Id.* (alterations in original) (quoting *Araujo-Cortes v. Shanahan*, 35 F. Supp. 3d 533, 538 (S.D.N.Y. 2014)); *see Jose J. O. E.*, 797 F. Supp. 3d at 965 (same). Moreover, Hernan Jose M. M. would not have needed to seek habeas relief in federal court were it not for a change in DHS policy and the BIA's ruling that immigration judges lack authority to hear bond requests or to grant bond to noncitizen detainees, *In re Yajure Hurtado*, 29 I. & N. Dec. 216, 229 (B.I.A. 2025)—a position the Government endorses in this very proceeding, *see* ECF No. 9 at 1. Here, common sense dictates that requiring Hernan Jose M. M. to first request a bond hearing before an immigration judge (which would undoubtedly be denied pursuant to *Yajure Hurtado*) would be an "exercise in futility," which excuses any prudential exhaustion requirement. *Jose J. O. E.*, 797 F. Supp. 3d at 966 (citation omitted).

For these reasons, the Court concludes that it has subject-matter jurisdiction to hear Hernan Jose M. M.'s claims.

## II.    Termination of Hernan Jose M. M.'s Parole

Hernan Jose M. M. primarily asserts that DHS's termination of his parole was unlawful because his parole "was not revoked pursuant to an individualized determination." ECF No. 10 at 2. The Government contends that "[n]o 'individualized' assessment was required or appropriate" because Hernan Jose M. M.'s parole "was never cancelled" but, rather, automatically expired. ECF No. 9 at 17. While the Court disagrees with the Government's assertion that DHS did not terminate Hernan Jose M. M.'s parole, the Court nonetheless concludes that the termination was lawful.

The INA grants the Secretary of Homeland Security the discretionary authority, within certain confines, to grant parole to noncitizens:

> The Secretary of Homeland Security may . . . in [her] discretion parole into the United States temporarily under such conditions as [she] may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Secretary of Homeland Security, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States.

8 U.S.C. § 1182(d)(5)(A). In short, to parole a noncitizen into the United States, the Secretary must determine "on a case-by-case basis" whether there are "urgent humanitarian reasons or [a] significant public benefit" to do so. *Id.* To revoke that parole status, the Secretary must determine either that those purposes "have been served," *id.*, or that "neither

humanitarian reasons nor public benefit warrants the continued presence of the alien in the United States," 8 C.F.R. § 212.5(e)(2)(i). And if the Secretary seeks to terminate a noncitizen's parole status prior to its expiration, the Secretary must provide written notice to the noncitizen of that termination. *Id.*

Importantly, while a grant of parole under Section 1182(d)(5)(A) requires a "case-by-case" determination, the statute contains no such limitation on the termination of parole. *See* 8 U.S.C. § 1182(d)(5)(A). Absent any such express statutory requirement, "one cannot necessarily presume that termination of parole must proceed case-by-case merely because the granting of parole proceeds case-by-case." *Doe v. Noem*, 152 F.4th 272, 286 (1st Cir. 2025). As the First Circuit recently explained when confronted with this exact issue:

> When Congress uses limiting language—as it does in the antecedent clause—"we must give effect to, not nullify, Congress' choice to include limiting language in some provisions but not others." *Gallardo ex rel. Vassalo v. Marstiller*, 596 U.S. 420, 431 (2022). Giving every word effect, the statutory text thus reflects a deliberate choice on the part of Congress to require the Secretary to implement a case-by-case approach to granting parole, but not to end such grants. The statutory text, therefore, favors an interpretation that the "case-by-case" requirement only limits the Secretary's discretion to grant parole.

*Id.*

The Court finds the First Circuit's reasoning persuasive. Here, Hernan Jose M. M. was granted parole under the Venezuelan Parole Program, which identified specific purposes for such grants of parole. *See generally* Implementation of a Parole Process for Venezuelans, 87 Fed. Reg. 63507 (Oct. 19, 2022); *see* ECF No. 1-1. DHS later determined that the Program no longer "serve[d] a significant public benefit." Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans, 90 Fed. Reg. 13611, 13612

(Mar. 25, 2025). "Once the executive branch determines . . . that achieving the policy aim is no longer possible or desired, then it takes no individualized determination in any way to ascertain those persons for whom it can no longer be said that parole furthers the country's interest." *Doe*, 152 F.4th at 286.

Hernan Jose M. M. asserts that the "mass revocation" of parole absent an "individualized determination that the purposes of parole had been served" was "arbitrary and capricious and in violation of the APA." ECF No. 1 ¶ 60. But in the Federal Register Notice terminating the Venezuelan Parole Program, DHS concluded that the termination was "appropriate and necessary" and directed individuals paroled under the Program "without a lawful basis to remain in the United States" to "depart the United States before their parole termination date." Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans, 90 Fed. Reg. 13611, 13611–12 (Mar. 25, 2025). And whether one agrees with DHS's decision, the Federal Register Notice offers explanations and evidence in support of its conclusion, independent of President Trump's directive in Executive Order No. 14165. *See id.* at 13612–17. The Federal Register Notice therefore appears to fulfill the Secretary's regulatory requirement to determine that "neither humanitarian reasons nor public benefit warrants the continued presence" of such parolees in the United States. 8 C.F.R. § 212.5(e)(2)(ii). Under these circumstances, the Court cannot conclude that DHS's decision to terminate the Venezuelan Parole Program broadly, or Hernan Jose M. M.'s grant of parole specifically, was arbitrary and capricious. *See Missouri ex rel. Bailey v. U.S. Dep't of Interior, Bureau of Reclamation*, 73 F.4th 570, 576–77 (8th Cir. 2023) (citation omitted) (explaining that an agency action is "arbitrary and

14

capricious" if the agency "relied on factors" which Congress had "not intended it to consider," "entirely failed to consider an important aspect of the problem," or "offered an explanation for its decision that runs counter to the evidence" or "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise").

Hernan Jose M. M. raises no argument that the Federal Register Notice does not constitute sufficient written notice under 8 C.F.R. § 212.5(e)(2)(ii) or that he was otherwise unaware of the March 2025 Federal Register Notice when he received his Termination Notice in June 2025. But it is worth noting that even assuming, for argument's sake, the Federal Register Notice was insufficient or that the termination of Hernan Jose M. M.'s parole was otherwise unlawful, it cannot be disputed that Hernan Jose M. M.'s two-year parole period would have expired on August 5, 2025. *See* ECF No. 1-1. Moreover, on October 4, 2024—more than five months before DHS terminated the Venezuelan Parole Program and, indeed, under the presidential administration that implemented that Program—DHS "announced that there would be no 're-parole' beyond the initial two-year period for the parolees who entered the United States under the CHNV parole programs." Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans, 90 Fed. Reg. 13611, 13614 n.24 (Mar. 25, 2025). As such, Hernan Jose M. M. would not have been able to renew his parole under the Venezuelan Parole Program once it expired, and there is no evidence in the record to suggest that Hernan Jose M. M. sought a separate grant of parole through other means. Accordingly, regardless of whether Hernan Jose M. M.'s parole was terminated lawfully before it would have expired automatically in August 2025, he did not have valid and active parole status in January 2026 when he was

arrested and detained by ICE.  His status as a parolee simply came to its predetermined end.

### III.    Mandatory Detention

Having concluded that the termination of Hernan Jose M. M.'s parole was lawful, the Court must determine whether he is subject to mandatory detention under Section 1225(b)(2) pending the conclusion of his removal proceedings, as the Government argues, or whether he is subject to discretionary detention and entitled to a bond hearing under Section 1226(a), as Hernan Jose M. M. argues.  The Government argues that Hernan Jose M. M. must be treated as if he was never paroled, so his detention is now mandatory under Section 1225.  Hernan Jose M. M. argues that because he is not an arriving alien and because he was previously paroled into the United States, by the terms of the statute itself he does not fall within the mandatory detention provisions of Section 1225.  The Court concludes that Section 1226 applies.

Section 1225(b)(2) requires that, "in the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained" for ordinary removal proceedings under 8 U.S.C. § 1229a.  Therefore, to be subject to mandatory detention under Section 1225(b)(2), a noncitizen must both be an "applicant for admission" and "seeking admission" at the time of his arrest.  *See* 8 U.S.C. § 1225(b)(2). The statute does not define the term "seeking admission," but this Court has consistently held that "to be 'seeking admission,' one must be presently seeking 'entry'; that is, 'coming from outside' into the United States."  *Victor Hugo D. P. v. Olson*, No. 25-cv-4593

(LMP/DTS), 2025 WL 3688074, at *2 (D. Minn. Dec. 19, 2025) (quoting *United States ex rel. Claussen v. Day*, 279 U.S. 398, 401 (1929)); *see, e.g.*, *Roberto M. F. v. Olson*, No. 25-cv-4456 (LMP/ECW), 2025 WL 3524455, at *4 (D. Minn. Dec. 9, 2025) (holding that "a noncitizen who is present in the United States" for several years "is not 'seeking admission'" under Section 1225(b)(2)); *Belsai D. S. v. Bondi*, No. 25-cv-3682 (KMM/EMB), 2025 WL 2802947, at *6 (D. Minn. Oct. 1, 2025) ("One who is 'seeking admission' is presently attempting to gain admission."). Such noncitizens "'*shall be* detained for a [removal] proceeding' if an immigration officer 'determines that [they are] not clearly and beyond a doubt entitled to be admitted' into the country." *Jennings*, 583 U.S. at 288 (alterations in original) (emphasis added) (quoting 8 U.S.C. § 1225(b)(2)(A)).

Section 1226, on the other hand, "applies to aliens *already present* in the United States." *Id.* at 303 (emphasis added). Under Section 1226, if a noncitizen who is already present in the United States is arrested and detained for the purpose of effecting his removal, the Government "*may* continue to detain the arrested alien." 8 U.S.C. § 1226(a)(1) (emphasis added). The Government also "may release" the noncitizen "'on . . . bond' or 'conditional parole'" so long as the noncitizen does not "fall[] into one of several enumerated categories involving criminal offenses and terrorist activities." *Jennings*, 583 U.S. at 288–89 (quoting 8 U.S.C. § 1226(a)(2)–(3)). Detention under Section 1226(a), therefore, is discretionary, not mandatory. *Id.* at 300 (citation omitted) ("Unlike the word 'may,' which implies discretion, the word 'shall' usually connotes a requirement.").

When a grant of humanitarian parole under Section 1182 is terminated or expires, the noncitizen "shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States."  *See* 8 U.S.C. § 1182(d)(5)(A). The Government contends that this "returned to the custody" language means Hernan Jose M. M. is subject to mandatory detention under Section 1225(b)(2) because he "maintained his status as an 'arriving alien'" when he was paroled into the United States.  ECF No. 9 at 2–3.  But nothing in the text of Section 1182(d)(5)(A) requires "that a noncitizen is returned to the 'status' they held upon their parole, that they revert to [the] status as an 'arriving alien,' or that they must be detained."  *Qasemi v. Francis*, No. 25-cv-10029 (LJL), 2025 WL 3654098, at *10 (S.D.N.Y. Dec. 17, 2025); *see Clark v. Martinez*, 543 U.S. 371, 385 (2005) ("[W]e find nothing in [Section 1182(d)(5)(A)] that affirmatively authorizes detention, much less indefinite detention.").  Instead, the statute says that two things happen to a noncitizen following termination or revocation of his parole: (1) he "shall forthwith return or be returned to the custody from which he was paroled"; and (2) "thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States."  8 U.S.C. § 1182(d)(5)(A).

More to the point, the key problem with the Government's argument is that Section 1182(d)(5)(A) "does not require the Court to pretend that [Hernan Jose M. M.] was never paroled and permitted to live freely in this country."  *Qasemi*, 2025 WL 3654098, at *10. Nor does it require that Hernan Jose M. M. be considered an "arriving alien" even though he has been present inside this country for more than two years.  *See id.* ("A noncitizen is

18

not reverted by operation of law to status as an arriving alien—they remain a noncitizen living in the United States who used to be paroled . . . .").  Rather, it requires that Hernan Jose M. M. "be dealt with in the same manner as that of any other applicant for admission to the United States."  8 U.S.C. § 1182(d)(5)(A); *see also Qasemi*, 2025 WL 3654098, at *11.

In this case, that means a noncitizen who has applied for admission and is already physically present in the United States.  Indeed, this conclusion is supported by USCIS's own representation to Hernan Jose M. M. in acknowledging receipt of his asylum application: "You may *remain in* the United States until your asylum application is decided."  ECF No. 1-5 at 1 (emphasis added).  Hernan Jose M. M. cannot "remain in" a place where he is not already physically present or has not yet arrived.  USCIS's subsequent issuance of employment authorization to Hernan Jose M. M., ECF No. 1-3, further supports this position.  Consequently, while Hernan Jose M. M. was an "applicant for admission" at the time of his arrest in January 2026, he was not "seeking admission" because he was already present in the United States.

What does this mean for Hernan Jose M. M.?  He simply remains a noncitizen in the United States who used to be paroled.  Because he was not "seeking admission" as that phrase is understood in Section 1225(b)(2), *Victor Hugo D. P.*, 2025 WL 3688074, at *2, he is not subject to mandatory detention under Section 1225(b)(2), *see, e.g.*, *id.* at *2–3; *Roberto M. F.*, 2025 WL 3524455, at *4.  Instead, Hernan Jose M. M. is subject to detention, if at all, under the discretionary framework of Section 1226(a), which "applies to aliens already present in the United States." *Jennings*, 583 U.S. at 303; *Rodriguez-Acurio*

19

*v. Almodovar*, No. 2:25-cv-6065 (NJC), 2025 WL 3314420, at \*24–25 (E.D.N.Y. Nov. 28, 2025) (quoting *Jennings*, 583 U.S. at 289) (holding that Section 1226(a) "authorizes the Government to detain certain aliens already in the country pending the outcome of removal proceedings"). Accordingly, Hernan Jose M. M. is entitled to the procedural protections provided by Section 1226(a), including a bond hearing. *See, e.g.*, *Roberto M. F.*, 2025 WL 3524455, at \*4.

To conclude otherwise "would lead to a senseless outcome; the noncitizen like [Hernan Jose M. M.] who is present and entered the country through a lawful process would still be 'arriving' in the country"—and therefore subject to mandatory detention under Section 1225(b)(2)—"whereas one who entered without any inspection or without any process whatsoever would not." *Qasemi*, 2025 WL 3654098, at \*7 (citing *Aviles-Mena v. Kaiser*, 2025 WL 2578215, at \*5 (N.D. Cal. Sept. 5, 2025)). Instead, the Court's conclusion here does nothing more than deal with Hernan Jose M. M.'s case in "the same manner" as a similarly situated applicant for admission who is already physically present in the United States. *See* 8 U.S.C. § 1182(d)(5)(A); *see also, e.g.*, *Roberto M. F.*, 2025 WL 3524455, at \*4; *Victor Hugo D. P.*, 2025 WL 3688074, at \*2–3.

Accordingly, the Court grants Hernan Jose M. M.'s petition and orders the Government to conduct a bond redetermination hearing as set forth below.[5]

---

[5]    Because the Court grants relief to Hernan Jose M. M. on his INA claim, the Court need not reach his remaining constitutional claim. *See United States v. Turecheck*, 138 F.3d 1226, 1229 (8th Cir. 1998).

20

## ORDER

Based on the foregoing, and on all the files, records, and proceedings in this matter,

**IT IS HEREBY ORDERED** that:

1.  Hernan Jose M. M.'s Petition for Writ of Habeas Corpus (ECF No. 1) is **GRANTED**;

2.  The Government is **ORDERED** to provide Hernan Jose M. M. with a bond redetermination hearing under 8 U.S.C. § 1226(a) on the merits of his release by no later than **Thursday, March 5, 2026**;

3.  If the Government does not provide Hernan Jose M. M. with a bond redetermination hearing in accordance with this Order, the Government is **ORDERED** to release Hernan Jose M. M. from detention immediately;

4.  The Government is **ORDERED** to provide the Court with a status update by no later than **5:00 p.m. on Friday, March 6, 2026**, concerning the results of any bond redetermination hearing conducted pursuant to this Order or, if no bond hearing was held, Hernan Jose M. M.'s release from detention; and

5.  Hernan Jose M. M.'s Motion for Temporary Restraining Order and Preliminary Injunction (ECF No. 2) is **DENIED** as moot.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: February 27, 2026            *s/Laura M. Provinzino*
                                    Laura M. Provinzino
                                    United States District Judge